IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

POWERSECURE, INC.,

    Plaintiff,

v.

TRUSTED TRANSFORMER
ENTERPRISE SOLUTIONS, LLC,
and JACK ROBERTS,

    Defendants.

CASE NO:

**JURY TRIAL DEMANDED**

# COMPLAINT

Plaintiff PowerSecure, Inc. ("PowerSecure") files this Complaint against Defendants Trusted Transformer Enterprise Solutions, LLC ("TTES") and Jack Roberts ("Roberts") and alleges as follows:

## NATURE OF THE ACTION

1. This is an action arising out of a contract between PowerSecure and TTES to purchase transformers. Roberts made fraudulent misrepresentations to PowerSecure that PowerSecure relied upon in entering into the contract, and TTES subsequently breached that contract, causing PowerSecure to incur significant damages.

## THE PARTIES

2. PowerSecure is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Durham, North Carolina.

3. TTES is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Fort Lauderdale, Florida. TTES can be served through its registered agent, Jack Roberts, 2143 Northeast 65th Street, Fort Lauderdale, FL 33308.

4. Roberts is an individual residing in Fort Lauderdale, Florida. Roberts is the CEO of TTES and, upon information and belief, the principal and sole member of TTES.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because PowerSecure, on the one hand, and TTES and Roberts, on the other hand, are citizens of different states and the amount in controversy exceeds $75,000.

6. This Court has personal jurisdiction over TTES because it is headquartered in and conducts business in the State of Florida.

7. This Court has personal jurisdiction over Roberts because Roberts is domiciled in the State of Florida.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the acts, events, or omissions giving rise to the claims occurred in this District.

9. Venue is also proper in this Court because TTES maintains its headquarters in and conducts business in this district and because Roberts resides in this district.

## FACTUAL BACKGROUND

10. PowerSecure provides distributed energy solutions for industrial, institutional, and commercial clients. Among other things, those solutions help PowerSecure's customer generate and store energy so that they can operate with greater energy efficiency and do so independently from the electric grid when necessary.

11. TTES holds itself out as a "reliable transformer industry leader in the USA" that promises "industry-leading shipping time, with an average delivery of…transformer[s] in just 24 weeks."[1]

### *The Microgrid Project*

12. On or about February 14, 2023, PowerSecure entered into an agreement with a customer for the engineering, procurement, and construction of a microgrid in Phoenix, Arizona (the "Microgrid Project").

---

[1] *See* https://ttesusa.com/.

3

13. Pursuant to its agreement with its customer, PowerSecure agreed to perform or cause to be performed all work required in connection with the design, engineering, construction permitting, procurement, construction, startup, demonstrating, and testing of the Microgrid Project.

14. PowerSecure further agreed to provide or cause to be provided all goods, services, materials, equipment, machinery, tools, labor, transportation, construction fuels, chemicals, construction utilities, administration, and other services and items required to complete the Microgrid Project.

15. Among other things, PowerSecure agreed to provide fourteen (14) utility grade, pad mounted, FR3 oil-filled transformers rated at 5000kVA; 34.5kV-600V/347V, Wye:Wye.

## *The Transformer Purchase Order*

16. Time was truly of the essence for the delivery of the transformers. PowerSecure could not complete the Microgrid Project for its customer without the transformers, and PowerSecure needed to complete the Microgrid Project quickly and efficiently.

17. To obtain the transformers required for the Microgrid Project quickly, PowerSecure solicited multiple bids from various vendors.

18. During the bid and quote process, Jack Roberts represented that TTES would have the fastest delivery time of all of the vendors from whom PowerSecure solicited bids and quotes.

19. In fact, Roberts represented that TTES could beat its advertised averaged delivery time of twenty-four (24) weeks and could deliver all fourteen (14) transformers within twenty (20) weeks of PowerSecure's acceptance of drawings and payment.

20. Based primarily on Roberts's representations regarding TTES's promised delivery time, on or about August 30, 2023, PowerSecure contracted with TTES for the purchase of fourteen (14) transformers from TTES at $188,000 per transformer for a total of $2,632,000.00 (the "Purchase Order").

21. Pursuant to the Purchase Order, TTES agreed it would be subject to liquidated damages in the amount of $2,500 per day, per transformer that was not on site of the Microgrid Project within twenty (20) weeks of PowerSecure's acceptance of drawings and second billing payment.

22. TTES agreed to the terms of the Purchase Order and began invoicing PowerSecure for the costs of the transfers. PowerSecure, in turn, fully performed its obligations: between September 2023 and April 2024, PowerSecure made six (6) payments to TTES that totaled the full sum of the Purchase Order and the value of

the transformers—$2,632,000. TTES agreed to deliver the transformers to PowerSecure by July 5, 2024.

23. The Purchase Order, TTES's agreement to provide the transformers, and PowerSecure's payment for the transformers in full constituted a valid, binding, and enforceable contract between PowerSecure and TTES.

### *Roberts's Fraudulent Misrepresentations*

24. Roberts fraudulently induced PowerSecure to enter into the Purchase Order by representing that TTES intended to perform the Purchase Order and intended to deliver the transformers by July 5, 2024. Roberts, however, knew that TTES was incapable of living up to his representations, and he went to great lengths to conceal that fact from PowerSecure.

25. In fact, TTES only delivered six (6) of the fourteen (14) transformers by the agreed-upon delivery date. When PowerSecure inquired about the missing transformers, Roberts became evasive and then, over the ensuing months, offered a shifting series of increasingly improbable explanations, each of which turned out to be false.

26. After numerous efforts to reach Roberts, in or around November 2024 he eventually claimed that the missing eight (8) transformers were being held in a bonded warehouse in south Texas. Roberts claimed that the transformers simply

needed to "clear customs" before a delivery company could pick them up. This was untrue.

27. PowerSecure requested the opportunity to send a technician down to the bonded warehouse to inspect the transformers, but Roberts claimed that an inspection would be impractical. He, however, continued to represent to PowerSecure that the transformers were simply in the process of "clearing customs."

28. On Wednesday, December 4, 2024, Roberts emailed representatives of PowerSecure and claimed that he was obtaining the final documents necessary to release the transformers and would provide another update by the end of the week. A copy of the ensuing email communications is attached hereto as **Exhibit A**.

29. Upon further questioning from PowerSecure, Roberts changed his story, now claiming that there was some unspecified legal dispute in Mexico concerning the missing transformers. For example, on Wednesday, December 11, 2024, Roberts emailed representatives of PowerSecure and claimed that "the courts ha[d] accepted [TTES's] paperwork of proof of ownership." Roberts further stated that the transformers would be released to TTES's custody before December 18, 2024. This too was untrue.

30. On December 18, 2024, representatives of PowerSecure contacted Roberts for another status update. Roberts claimed, at that point, that the plan was

to have the transformers delivered on December 27, 2024, or December 30, 2024, and that he would confirm the delivery date by December 20, 2024.

31. PowerSecure notified Roberts that the anticipated delivery dates would require logistical planning in advance, as the delivery dates were near the holidays, and PowerSecure would need to coordinate additional resources. As such, PowerSecure would need to have the confirmed delivery dates well in advance. Roberts again stated that he would have a confirmed delivery date by December 20, 2024.

32. Due to limited on-hand resources, PowerSecure made arrangements for a January 2, 2025, delivery date for the remaining eight (8) transformers and requested confirmation from Roberts that the transformers could be delivered on that date. Roberts subsequently confirmed that delivery date to PowerSecure.

33. Despite his assurances, Roberts later told PowerSecure that the delivery date would have to be postponed to January 6, 2025. Roberts assured PowerSecure that was a confirmed delivery date.

34. On the morning of January 6, 2025, after having not received the transformers, PowerSecure again requested confirmation that the transformers would arrive that day, reiterating that it had spent time and resources securing the labor and equipment needed to receive the transformers.

35. Roberts offered no excuse for his failure to deliver the transformers on January 6 as promised, but he eventually claimed the transformers would be delivered on January 31, 2025.

36. After the confirmed January 31 delivery date came and went without the delivery of the remaining transformers, Roberts notified PowerSecure that all eight (8) transformers were now supposedly *back* in Mexico and were expected to cross the border "at any moment."  At that time, Roberts blamed the delay at the border on ongoing "tariff issues."  Like virtually everything he had said in the preceding three months, this was also untrue.

37. On February 6, 2025, Roberts notified PowerSecure that the transformers had still not cleared customs, but that the necessary paperwork had been submitted and accepted by the necessary parties.

38. On February 12, 2025, after not receiving any updates from Roberts or TTES, PowerSecure again contacted Roberts for a status update.  Roberts stated that the transformers had passed inspections and were "in CBP processing," and would subsequently be released.

39. On February 13, 2025, Roberts notified PowerSecure that he expected the transformers to be released within "the next 24 to 36 hours."

40. On February 17, 2025, after still not receiving any updates from Roberts or TTES, PowerSecure notified Roberts that it was at risk of missing its commitment

to APS regarding the Microgrid Project and needed the transformers urgently. The following day, Roberts stated that he expected the transformers to cross the border that day—February 18, 2025.

41. On February 20, 2025, Roberts notified PowerSecure that the transformers had finally crossed the border, that the transformers had been assigned to a truck for delivery, and that he would send a bill of lading the following morning "at the latest." Following that series of untruths, Roberts went radio silent for another week.

### *Roberts's Reversal and Admission of Fraudulent Misrepresentations*

42. Finally, on February 27, 2025, Roberts contacted PowerSecure and came clean about the eight (8) unaccounted for transformers. Roberts admitted that he had been "lying" to PowerSecure about the transformers and admitted that real problem was that he had not paid his subcontractor (U.S. Electric) for the remaining transformers—despite TTES being fully paid by PowerSecure—and the transformers were being held at their original manufacturing facility in Monterrey, Mexico. U.S. Electric, Roberts explained, would not release the transformers to his custody because of the nonpayment.

43. In other words, each and every aforementioned "status update" provided by Roberts over the course of *months* was a lie, and he told those lies in an

effort to conceal the fact that TTES was not able to perform the Purchase Agreements as Roberts had promised.

44. During the February 27 call, after coming clean about his fraudulent misrepresentations, Roberts again pivoted to lies, assuring PowerSecure that the debts would be resolved within "the next 24-72 hours" and that the transformers would be released on March 3, 2025.

45. After the transformers were not released on March 3, 2025, PowerSecure had to independently contact U.S. Electric and pay TTES's outstanding debt of approximately $765,000 USD for U.S. Electric to release the remaining eight transformers. In other words, PowerSecure had to pay for the same transformers twice. TTES never refunded PowerSecure any of the money it paid—in full—for all fourteen transformers.

\*   \*   \*

46. PowerSecure seeks recovery of all losses and damages relating to or arising out of the matters described above, including but not limited to, costs associated with delays regarding the Microgrid Project, the increased cost of completing the Microgrid Project, lost revenues, reputational harm, and all other damages and losses.

## Count One: Breach of Contract

47. PowerSecure adopts and re-alleges each and every material allegation contained in paragraphs 1 through 46 as if fully set forth herein.

48. The Purchase Order was a valid, binding, and enforceable contract between PowerSecure and TTES, and PowerSecure performed its obligations under the Purchase Order by paying TTES in full for the fourteen (14) transformers.

49. TTES breached the contract by failing to provide all fourteen (14) transformers by the agreed-upon delivery date.

50. TTES further breached the contract by wholly failing to provide eight (8) of the fourteen (14) transformers.

51. As a result of TTES's breach of its contractual duties, PowerSecure has incurred monetary and reputational damages for which it now sues.

**WHEREFORE**, PowerSecure demands judgment against TTES for compensatory damages in an amount to be determined by a jury, together with all out-of-pocket expenses, attorneys' fees, costs of litigation, and pre-judgment and post-judgment interest.

## Count Two: Fraud (Roberts)

52. PowerSecure adopts and re-alleges each and every material allegation contained in paragraphs 1 through 46 as if fully set forth herein.

53. As discussed in detail above, Roberts engaged in a fraudulent scheme to induce PowerSecure to enter into the aforementioned contract and pay TTES $2,632,000.00 for transformers that TTES never intended to deliver.

54. Roberts perpetrated his fraud with a pattern of misrepresentations to PowerSecure.

55. Without limitation, Roberts represented that TTES could beat its advertised averaged delivery time of twenty-four (24) weeks and could deliver all fourteen (14) transformers within twenty (20) weeks of PowerSecure's acceptance of drawings and payment.

56. Roberts then attempted to cover-up his misrepresentation with even more lies.

57. Roberts made these representations in connection with the Purchase Order and the Microgrid Project.

58. These representations were false when Roberts made them, and Roberts knew they were false.

59. Roberts also failed to provide all facts material to these representations and instead concealed facts material to them including that the remaining eight (8) transformers were on track to be delivered when they never were.

60. PowerSecure reasonably relied to its detriment on Roberts's fraudulent misrepresentations by, without limitation, submitting the Purchase Order, entering

into the contract with TTES, and by processing and remitting payment for the full amount of the fourteen (14) transformers.

61. PowerSecure has been damaged as a proximate result of Roberts's fraudulent statements and misrepresentations.

**WHEREFORE**, PowerSecure demands judgment against Roberts for compensatory and punitive damages in an amount to be determined by a jury, together with all out-of-pocket expenses, litigation expenses, attorneys' fees, and pre-judgment and post-judgment interest.

## DEMAND FOR TRIAL BY JURY

Plaintiff PowerSecure, Inc. demands a trial by jury on all issues that are so triable.

DATED: May 2, 2025.            */s/ Jacob M. Salow*
                               Jacob M. Salow, Esq.
                               Florida Bar No.: 1019760
                               Lightfoot, Franklin & White, LLC
                               The Clark Building
                               400 20th Street North
                               Birmingham, Alabama 35203
                               (205) 581-0700
                               (205) 581-0799 (Facsimile)
                               jsalow@lightfootlaw.com
                               *Attorney for Plaintiff*
                               *PowerSecure, Inc.*